Good morning, Your Honors. My name is Leonard Schwartzer. I represent the appellant here, the debtors and the case below in the Bankruptcy Court. This is an appeal from the Bankruptcy Appellate Panel, which modified the order of the Bankruptcy Court confirming a plan of reorganization. In this plan of reorganization, the debtors produced a solution which paid all their creditors in full and created a situation by which there was, in effect, a divorce between the debtors and Mr. Gonzales, who formerly had been partners and had many interacting relationships in their arrangements regarding the properties that were owned by the debtors and related parties. The key to deciding this appeal is whether an appellate court, whether it's this court or the Bankruptcy Appellate Panel, should defer to the factual decisions made by the bankruptcy judge that certain terms of the settlement were either implied by the discussion at the time the original settlement was outlined to the court or were necessary to the implementation of the plan. Why isn't that a question of law in the absence of correct testimony of consent? No, I think it's a question of fact. In other words, you have the judge was able to determine, if we're going to make this deal work, the debtors have to have the ability to deal with the property and parcel it freely without the only obligation they had was to pay Mr. Gonzales $10 million when the property was sold. That's really a question of fact, not a question of law, because it's not a decision of where you apply a case or anything. It's a question of the practical business approach that they had in front of them. And the practical business approach was this was intended to be a divorce between the parties. Mr. Gonzales got his properties. The debtors wouldn't interfere with that. The debtors got Parcel A, and Mr. Gonzales wouldn't interfere with their right to use it. The judge made that factual determination. Right. Well, let me put the question another way, because I take your point. But why wouldn't the BAP be in precisely the same situation as the bankruptcy court in making that determination, because the essential facts were undisputed? The question is how you interpret or how you apply the facts, right? So I agree with you, it's not a pure question of law, but on the other hand, with the facts are not disputed. I think the facts were disputed. In other words, we had at least five occasions where Gonzales' former counsel, not present counsel, stated in court, I agree that it's reasonable that loans up to $25 million can be secured by Parcel A and that Gonzales' $10 million transfer fee will be subordinated to those loans. The parties recognized, and I thought that was a statement upon which the judge could rely, that Mr. Gonzales recognized that there was either an implied term, that there would be an ability to borrow ahead of his $10 million transfer fee, or a term that was necessary to the implementation of the plan. Because remember, the debtors knew going into the settlement that they had to borrow money to cover certain other expenses other than the $10 million owed to Mr. Gonzales. And the only way they were going to raise the money necessary was to borrow against the property that they were getting at that time, free and clear, and to quote the language used at the original January 31st hearing, unencumbered. Wasn't the final agreement that the bankruptcy judge approved was that he could be subordinated up to $45 million? Even if only $10 million had been owed? No. That's the way the other side would like to put it. You have to remember, Parcel A consisted of 13 or 14, maybe 15 parcels. One of the parcels was the FLT parcel, which was not actually owned by the debtor. The debtor had a $20 million option to purchase the property. So going in, the $25 million was to be able to use to be – was allowed to be borrowed against the property, and that was offered by Mr. Gonzales' counsel. The $45 million comes if you exercise the option and turn the option parcel into an owned parcel, then you would have $20 million worth of debt, because obviously the optionee would then have to be paid the $20 million. That $20 million had to come from somewhere. And the idea is you would just switch from an option to owned, secured by a debt. That's where the $45 million came from. But the offer made by Mr. Gonzales' counsel was to allow $25 million to be borrowed, not counting necessarily the exercise of the FLT parcel option. So we're talking about $25 million to be borrowed against Parcel A, the property which was given up by Mr. Gonzales in exchange for his getting Parcel B, C, and D, which is property worth something in excess of $100 million. The point is, is that the judge was making a factual determination that this was necessary to carry out what the parties contemplated. If it was a factual determination, that would mean that this Court and the Bankruptcy Appellate Panel was supposed to provide deference to this and not reverse it unless it was clearly erroneous. If you're taking it as a combined issue, it still seems to me that you're dealing with a factual determination where deference has to be given to the bankruptcy judge who was there, went through, listened to a two days of confirmation hearings about what the property was, the necessity of treating this as an aggregation that had much more value when it's put together than 18 parcels, and the importance of having the ability to borrow money in order to main the ownership of the 18 parcels together. For example, on the Harambee, the FLT parcels, there was a million dollars that had to be paid to extend the option another year. The following year, another million dollars would have to be borrowed. That money didn't come from the operation of the property, because the property is basically vacant parcels that are being hauled for development except for one apartment complex. And so it was always contemplated that there would be funds to be borrowed against the property, and the bankruptcy court saw that and basically put in what was obvious to the parties to begin with. And the point that bothers me is that when Mr. Gonzales' counsel says and the BAP says he didn't agree to it, you look at the hearings on March 26th and March 31st, where his counsel says, okay, we agree that you could borrow $25 million. We agree. And then the bank – somehow the BAP says it didn't happen. It didn't happen. That was not a specific term mentioned on January 31st, but it was a specific term mentioned on March 26th and March 31st. Your Honor, in addition, I just would point out that it is our position that this – the proper thing for this Court to do would be to vacate the BAP's decision because this appeal should have been dismissed. There are third-party lenders who have loaned $10.2 million against this property on the basis of there being a subordination agreement as part of the settlement, as part of the plan. What happens to those people? They relied upon a court order when there was no stay. Do you think sophisticated business people should rely on a court order that they know is subject to appeal? Yes, Your Honor. We think they should be allowed to rely upon a court order that's subject to appeal because in this case it would be unfair to put them in jeopardy when they have a court order and they know that there is no stay pending appeal. Mr. Gonzalez did attempt to get one, but the BAP denied, ultimately denied his request for a stay pending appeal. That – yes. It would be – it seems to me that what you have here is people relying upon a final court order, upon an order of the court where there's no stay pending appeal. They look at the bankruptcy code and they look at cases related to the bankruptcy code and says, when you can't straighten this out, the appeal should be dismissed. And what we've had here is we have a situation where people loan $10.2 million and this appeal should be dismissed. You know, the descending judge in the BAP said that, you know, he thought there was a settlement agreement reached on January 31st, but there was no – when they read in the outline of that agreement on January 31st, it didn't include the subordination agreement. So he agreed with the majority as to the subordination agreement. Is that true, that the January 1st outline of the agreement wasn't stated in court that the subordination had been done? That is true, Your Honor. But there were also dozens of terms that weren't stated at the January 31st. At the January 31st hearing, I stated – I was there, so I remember this – I said this is an outline of the agreement. For example, there was a whole argument, and you'll see in the record about – You answered my question. Oh, I'm just saying there's an argument in the record about – you'll see about representations and warranties that the debtor had to give to Mr. Gonzales when he got his property. There was no mention of representation warranties at the January 31st hearing. However, Mr. Gonzales argued for it and got that from the bankruptcy judge, just like the debtors argued for and got the subordination agreement to make the plan of settlement work. Thank you. Thank you, counsel. Good morning. James Kilkowski for Mr. Gonzales. May it please the Court. The issue in this case is what happened on January 31 of 2003. That's what the bankruptcy court said it was going to do. That's what Mr. Schwarzman has asked this Court to do. And that's what we asked this Court to do. To return to Judge Thomas's question, this Court and the BAP are in just as good a position to determine whether a settlement existed on that record or not, because the bankruptcy judge said we are looking solely at this record on January 31st to make a determination, one, as to whether there was a settlement agreement, and, two, what the terms of that settlement agreement were. Before I do the rest of my argument, I'd just like to make clear, we want in this Court a memorandum without a subordination provision, because that's what we negotiated for, and that's what the outline of the settlement agreement on January 31st said. We don't believe a settlement agreement exists, but we're willing to live with the confirmation order and everything else that happened, except for the subordination of this memorandum. Under the settled law of this Circuit, this Court reports this to the BAP. Excuse me. What's the current status of the property? I take it it's, nothing is happening with the property, or what's continuing? I don't believe so. I believe that there are the two loans that have been mentioned. I believe there are efforts to sell it, but I don't know of any efforts that have been successful. Under the settled law of this Circuit, this Court enforces settlement agreements, not contemplations. That's the Calley case and the Neer case. And in the, sorry, Calley v. Neer and Maynard. In the Maynard case, it was a $2,500 case in which there was supposed to be a letter of assurances as to the fact that the litigation would not be used against the employee in terms of the evaluation. The attorneys couldn't agree on the language, and despite the fact that it was announced on the record, the magistrate judge said this case is settled. The Ninth Circuit said there is no settlement agreement because there is no agreement about language of this simple letter in a $2,500 case. Here, the January 31 transcript says specifically that this deal is subject to agreement on tax allocations and it is subject to the agreement on acceptable language. Now, this is a $200 million transaction, not a $2,500 transaction, a $200 million transaction in terms of the conveyance of the 65 percent of New World that Mr. Gonzales didn't own to Mr. Gonzales, and that number is based on his payment of $77 million for 35 percent. Plus, there was a transfer of his $41 million trust deed from Parcel A over to the equity interest. Those tax allocations are critical. The record shows that the accountants for the parties spent days working on those tax allocations, and then at the last moment, the debtor came in and said, we don't agree to those tax allocations. There were days and tens of thousands of dollars spent on negotiations over what the settlement agreement was supposed to say. And the best evidence of what was meant and the difficulties that were and that occurred with respect to the negotiation is in our the supplemental excerpts of record, tab number 9, on page 16. There is an extensive term sheet that gets sent out by Mr. Gonzales in February of 2003, right after this supposed settlement took place. Then in March, Mr. Schwarzer comments and replies and sends out his e-mail. And his e-mail says, "'Attached hereto and included below is a draft of a proposed term sheet that more accurately states the agreement among the parties discussed in the bankruptcy court on January 31st.'" Neither Gonzales's memo nor Schwarzer's e-mail mentions subordination to anything, subordination of the parcel A transfer fee to anything. So a month later, Mr. Schwarzer hadn't even thought about subordination, and when he describes the more accurate terms of the settlement agreement, doesn't even conclude it. This never came up. Subordination did not come up until March 26th in a hearing before Judge Jones in the bankruptcy court. So far from being on everybody's mind and far from being something that was explicitly agreed to, it never came up until close to two months after the supposed settlement agreement took place. One comment I'd like to make is, is that much of the briefing seems to me to be peripheral, because it talks about what happened afterwards, after January 31st. What the bankruptcy court said it was doing was interpreting the terms of that January 31 transcript, and only that. So try as I might in making this point in my brief, I've not been able to elicit from Mr. Schwarzer, nor has the Court, nor did the BAP, any reference in the record whatsoever to Mr. Gonzales's agreement to subordinate to $45 million subordination to $45 million worth of new financing. If that was a good idea, maybe it was. If the debtor needed it, maybe it was. But if the debtor needed it, why didn't it show up until nearly two months after this hearing took place? Why isn't it in the more accurate description of what the terms of the settlement were? Answer, there was never an agreement on that term. On the mootness point, I think it's completely clear that this appeal is not moot. The standard is, can any effective relief be given to Mr. Gonzales? We submit that Mr. Gonzales is very happy with the decision in the BAP. He likes the economic benefit that was conferred on him by the BAP. What the BAP did essentially is said, we're going to delete any references to subordination in the plan, in the settlement agreement, or in any of the settlement documents, so that Mr. Gonzales gets what he negotiated for, which was a memorandum. Let's record the memorandum against these parcels and then let the chips fall where they may. If the debtors can get financing with that memorandum on there, so be it. With respect to the existing lenders, the existing lenders made these loans not under 364, under which their loans would have been unassailable, but under the confirmed plan. They chose not to go the 364 route. J.P. Morgan and Specialty Financial, or Big Boys, Big Boys and Girls, they can look and learn, they know how to protect themselves. If they chose to make a loan based on the record that was before them and the goings on and the appeals in the bankruptcy court, that's really up to them. So whether we have a dispute with them down the road is another issue as to whether we are prior to them or not. Regardless of whether we're prior to them, if Gonzales's memorandum is recorded, he will have a cloud or a lien or whatever that memorandum happens to be on 13 out of the 18 parcels that comprise Parcel A. Not having to subordinate that memorandum on those 13 parcels is effective relief. Not having the threat that he would potentially be foreclosed out of his Parcel A transfer memorandum based on new money that were put into those parcels would be effective relief. To get, on our view, our argument, the first $10 million out of the sale of a piece of property is certainly a lot better than getting $45 to $55 million after $45 million is already paid to somebody else. I'd just like to also point out that there is no competent evidence in the record as to what these properties are worth. There is no evidence that would give Mr. Gonzales his $10 million if he had to wait until $45 other million were paid off to other lenders. So I think without a doubt, their effective relief was given by the bat, and if this Court affirms that ruling, Mr. Gonzales will be happy, I will be happy, and it will be effective relief. Thank you. Thank you, counsel. Do you have a rebuttal? Do you want to take a break after this one or after one more? I mean, I think the only thing I would like to respond to is just point again out to the record Mr. Gordon stating, as far as the other, we will concede, say, 25. You can borrow up to 25 million for any purpose. That's what Mr. Gordon said, and he said it about four or five times between the hearings of March 26th and March 31st. After that, the bankruptcy judge made the decision that it was appropriate to have a subordination clause in there, and when Mr. Gordon and Mr. Gonzales tried to back out of that offer, the judge didn't let him. So the fact is, there was an offer. The judge took it up and made the determination that was an acceptable way of dealing with the problem when Mr. Gonzales changed his mind later on. And he didn't – the judge didn't limit himself to just what was said at the March 31st hearing. That's why we both sides included transcripts of the hearings on March 10th, March 26th, March 31st, April 3rd. All those hearings count, too. Thank you. If you have any questions, I'll be happy to answer them. Thank you, counsel. The case just argued will be submitted.
judges: Reinhardt, Thomas, Restani